## THE STATE v. NIEHAUS, Appellant.

### Division Two, May 16, 1905.

1. **INDICTMENT: Conclusion: Murder: Manslaughter.** An indictment concluding thus: "And so the grand jurors aforesaid, upon their oath aforesaid, do say that the said Lambert Niehaus, the said Thomas Fluegel, in the manner and form and by the means aforesaid, feloniously, wilfully, deliberately, premeditatedly and of his malice aforethought, did kill and murder; contrary," etc., charges murder and not simply manslaughter.

2. **MURDER: Instruction for Murder in Second Degree.** Defendant went to a saloon about midnight and immediately after stepping into the room shot deceased, who at the time was sitting in a chair asleep, with his head resting in his hand, the arm on a table. Not a word was spoken by deceased, and several witnesses testified that deceased did not awake and made no movement of any kind, and there was no testimony to the contrary except that of defendant who testified that he and deceased were personal enemies, and that deceased was awake and started to rise from his chair and made a move as though going to hit him with the chair. There was testimony that defendant was at the same place the day before inquiring for deceased and threatening him, but defendant testified that he did not go to the saloon with any intention to do deceased any harm. *Held*, that there was no error in refusing to instruct the jury upon murder in the second degree.

3. ———: ———: **When Instructions Should be Given.** To reduce a homicide from murder in the first degree to murder in the second degree there must be some conduct on the part of the deceased reasonably calculated to arouse passion on the part of the slayer.

4. ———: **Evidence: Collateral Matters.** Evidence in a murder case of the defendant's reputation for industry, his being intoxicated, certain incidents of trouble between him and deceased which occurred months before, and of the character of the people who visited the saloon where the homicide occurred, should be excluded, for they furnish no defense to the charge of murder, nor tend to prove or disprove any issue involved in the case.

Appeal from St. Louis City Circuit Court.—*Hon. Daniel G. Taylor*, Judge.

AFFIRMED.

*John A. Porter* for appellant.

(1)   The indictment in this case charges the defendant with manslaughter and not with murder. There is nothing in this case to sustain the judgment. State v. Cook, 170 Mo. 210; State v. Ferguson, 152 Mo. 98; State v. Sanders, 158 Mo. 610; State v. Myers, 99 Mo. 115; 3 Chitty's Criminal Law, 750; Wharton on Homicide, sec. 49.   (2)   Defendant prayed the court for an instruction on murder in the second degree. The court should have instructed on a lower grade of homicide than murder in the first degree. There was no evidence in this case that the act causing the death was premeditated. Where the evidence is such that the jury may convict of murder in the first degree or murder in the second degree, it is the duty of the court to give suitable instructions as to each grade. Failure to do this is a fatal error. State v. Robinson, 73 Mo. 306; State v. Curtis, 70 Mo. 594; State v. Anderson, 86 Mo. 310. If defendant had passion or excitement of mind, produced by some just cause of provocation, a murder under such passion, provocation or excitement was murder in the second degree. State v. Curtis, 70 Mo. 594; State v. Ellis, 74 Mo. 207.   (3)   The court erred in refusing to allow defendant to testify as to his motive in going to the place of the homicide, and why he went there to see the deceased. State v. Banks, 73 Mo. 592.

*Herbert S. Hadley,* Attorney-General, and *John Kennish,* Assistant Attorney-General, for the State.

(1)   The evidence is sufficient to support the verdict. Six witnesses testified that while the deceased was sitting in the chair sleeping the defendant entered the saloon and fatally shot him; that the deceased did not move or change his position, either before or after the shot was fired; that the defendant said at the time, ''I

am a murderer." "I have done what I wanted to." "If there is substantial evidence tending to show defendant's guilt, the sufficiency of the evidence to support the verdict will not be considered by the appellate court." State v. DeWitt, 152 Mo. 76; State v. Williams, 149 Mo. 496; State v. Frank, 159 Mo. 535. (2) The court submitted the case to the jury upon instructions on murder in the first degree, self-defense and reasonable doubt; and properly refused to instruct on murder in the second degree. There is not one word of evidence in the record to show the provocation or heat of passion necessary to reduce the grade of the crime to murder in the second degree. State v. Ellis, 74 Mo. 207; State v. Ferguson, 162 Mo. 668; State v. Tettaton, 159 Mo. 354; State v. Kotovsky, 74 Mo. 249; State v. Reed, 162 Mo. 312. (3) The court did not commit error in admitting or excluding evidence over defendant's objection. In the cross-examination of witness Reboe, defendant asked a question as to the character of the people who frequented the saloon in which the homicide occurred. An objection to this question was sustained and defendant excepted. This evidence was clearly inadmissible. An objection by the State to evidence of threats by the deceased against the defendant was sustained on the ground that there was no evidence of an assault by the deceased. Such evidence of threats was afterwards admitted, and therefore defendant cannot complain. Several objections were made and sustained to evidence offered by the defense, such as that defendant was intoxicated, as to defendant's reputation for industry, to all of which, we contend, objections were properly sustained. It was not error to exclude evidence as to defendant's reputation for industry. State v. Anslinger, 171 Mo. 600. Drunkenness is no excuse or justification for crime. State v. Kindred, 148 Mo. 270; State v. Harlow, 21 Mo. 446; State v. Ramsey, 82 Mo. 133. A homicide can not be justified by the previous threats of the de-

ceased, unaccompanied by any hostile demonstrations at the time of the killing. State v. Rider, 95 Mo. 474; State v. Harris, 59 Mo. 550; State v. Brown, 63 Mo. 439.

FOX, J.—This is an appeal by the defendant from a judgment of conviction of murder of the first degree in the circuit court of the city of St. Louis. The indictment upon which defendant was placed upon trial, omitting caption, charged the offense as follows:

"The grand jurors of the State of Missouri, within and for the body of the city of St. Louis, now here in court, duly impaneled, sworn and charged, upon their oath present, that Lambert Niehaus on the twentieth day of December, in the year of our Lord, one thousand nine hundred and three, at the city of St. Louis aforesaid, with force and arms, in and upon one Thomas Fluegel, in the peace of the State then and there being, feloniously, wilfully, deliberately, premeditatedly and of his malice aforethought, did make an assault; and that the said Lambert Niehaus a certain pistol then and there charged with gunpowder and one leaden bullet, then and there feloniously, wilfully, deliberately, premeditatedly, and of his malice aforethought, did discharge and shoot off, to, at, against and upon the said Thomas Fluegel and that the said Lambert Niehaus with the leaden bullet aforesaid, out of the pistol aforesaid, then and there by the force of the gunpowder aforesaid, by the said Lambert Niehaus discharged and shot off, as aforesaid, then and there feloniously, willfully, deliberately, premeditatedly, and of his malice aforethought, did strike, penetrate and wound the said Thomas Fluegel in and upon the head and body of the said Thomas Fluegel, giving to the said Thomas Fluegel then and there, with the leaden bullet aforesaid, so as aforesaid discharged and shot out of the pistol aforesaid by the said Lambert Niehaus in and upon the head and body of the said Thomas Fluegel, one

mortal wound of the depth of six inches and of the breadth of half an inch; of which mortal wound the said Thomas Fluegel then and there instantly did die.

"And so the grand jurors aforesaid, upon their oath aforesaid, do say that the said Lambert Niehaus, the said Thomas Fluegel in the manner and form, and by the means aforesaid, feloniously, wilfully, deliberately, premeditatedly and of his malice aforethought, did kill and murder; contrary to the form of the statute in such case made and provided, and against the peace and dignity of the State.

"W. SCOTT HANCOCK,<br>"Assistant Circuit Attorney."

Upon this charge as presented in the indictment, and after being duly arraigned and entering his plea of not guilty, the defendant was at the April term, 1904, of the said circuit court of the city of St. Louis, put upon his trial on the charge contained in the indictment.

The facts developed upon the trial were substantially the following:

Bremer's saloon is located at the northeast corner of Tenth and Soulard streets in the city of St. Louis. The front door of the saloon is on the northwest corner, there being a "cut off" on said corner so that the door fronts on both streets. On the west side of the saloon, from the door back, are a number of small tables along the wall. The bar is opposite these tables and on the east side of the room.

Thomas Fluegel, the deceased, was a brother-in-law of the defendant. About four months before the homicide, Fluegel's wife died. The defendant left the city of St. Louis soon after his sister's death and returned about a week before the homicide. The defendant seemed to have a grievance against Fluegel, growing out of their relationship, and on Saturday afternoon, the day before the homicide, went to Bremer's saloon somewhat under the influence of liquor, and

asked, ''Does Tom Fluegel hang out here?''   On being answered that Fluegel came there once in a great while, he made the remark that he would get him.

On Sunday night, the twentieth day of December, 1903, between half past eleven and twelve o'clock, several persons were in Bremer's saloon, some of them at the bar and others sitting at the tables on the west side of the room.   Thomas Fluegel entered the saloon that night, about a quarter past or half past eleven, and sat down in a chair on the south side of the table next to the front door, being about four or five feet back from the door.   In a short time Fluegel went to sleep and was sitting in the chair with his left arm on the table, resting the left side of his head upon his left hand, and with his right hand in his pocket.   In that position Fluegel was sleeping when between half past eleven and twelve o'clock the defendant came in the saloon, opening the door with his left hand.   Immediately upon entering he saw Fluegel and drawing a pistol from his overcoat pocket, turned to the west and shot Fluegel in the head.   At the time he fired he was about four feet from his victim.   The bullet entered about half an inch above the right ear, and coursing downwards and backwards lodged in the base of the brain. But one shot was fired and the wound was necessarily fatal.   Indeed, when Fluegel was shot, he continued in the same position as though still sleeping and never moved afterwards.

The defendant, after firing the shot, turned toward the bar and handed his pistol to William Nackenhorst, saying as he did so, ''I am a murderer.   I have done what I wanted to do.   I have got you.''   After his arrest he told the officer that the cause of the shooting was family troubles.

That we may fully appreciate the nature and character of the killing and the manner in which it was done, we here reproduce substantially the testimony of the witnesses.

Dr. H. F. Hochdoerfer testified substantially as follows: I am a physician and surgeon by profession. I have been connected with the coroner's office in this city as post-mortem physician. In my official capacity I held a post-mortem examination on the twenty-first day of last December on one Thomas Fluegel at the morgue. At the time I examined the body, he had been dead some hours; *rigor mortis* had set in. On examination, I found the body of a man about five feet eight inches tall, weighing about one hundred and sixty pounds. I found upon examining the head a gun shot wound half an inch above the right ear, penetrating the skull; opening the skull I found a gun shot wound entering the right side of the larger bone and involving the smaller bone; below I found the bullet at the base of the brain; the other organs of the body were normal. I found no other lesion of injury to the body, except this gun shot wound, the wound caused by the leaden bullet. Death was caused from a gun shot wound of the brain. A wound of that kind is necessarily fatal. The bullet entered half an inch above the right of the ear, coursed backwards and downwards, and lodged at the base of the brain. I guess the man to be between thirty and forty years of age.

William Nackenhorst, testifying in behalf of the State, stated: My name is William Nackenhorst; I live at 39 Barry street, and my work is granitoid maker; I know where Gus Bremer's saloon is, it is at Tenth and Soulard in the city of St. Louis. I was there on the night of the twentieth of December; it was Sunday night; I had seen the defendant Niehaus once or twice before that night. I knew Thomas Fluegel in his lifetime, and saw him there that night. I think it was about half past eleven, a quarter after or half past eleven that I saw him sitting asleep at the table. I saw Fluegel come in the saloon. I was standing at the bar as the defendant came in, my back was to the door; just as he closed the door I looked around;

as I looked around he fired the shot; at that time Flue-
gel was sitting at the table asleep.  Fluegel was sitting
on the west side; the bar is on the east side; Fluegel
was right back of the door, about four feet, I guess.   I
was standing at the bar with friends.  I had noticed
Fluegel sitting asleep between fifteen minutes and half
an hour, I don't remember exactly.  Fluegel had not
spoken to anybody or changed his position during that
time so far as I know.  When I turned around the de-
fendant closed the door; as I turned around he fired
the shot.  I rushed to him, grabbed him by the arm,
got hold of the gun, and he let loose of the gun and said,
"I am a murderer."  I gave the gun to Gus Bremer,
the saloon keeper.  I was there when the officers came.
Fluegel was still sitting in the chair in the same posi-
tion.  I noticed the wound on Fluegel's right temple
after the pistol was fired.   After the shot was fired,
Fluegel sat asleep, that was all, he never stirred.
About half an hour afterwards the police came.  Flue-
gel worked in a mill, a greaser for a flour mill.  This
all occurred in the city of St. Louis.  On cross-exami-
nation:  I work with a candy factory.  I was down
there spending that evening in the saloon.  I was per-
sonally acquainted with Fluegel, had known him for
fifteen or twenty years, I guess.  Fluegel came to the
saloon while I was there, think he was there about half
an hour or so before the shooting; I cannot say exactly.
When he came in the saloon he sat down and went
right to sleep a little bit afterwards.  He sat down in
the west part of the saloon.  The saloon is on the
northeast corner of Tenth and Soulard, and the door
to the saloon opens on the southwest corner.  Fluegel
came in at that door, not at the side door.  He was sit-
ting about four feet from the corner door I guess, and
opposite the door, and close to it.  The last time I
noticed Fluegel he was asleep and I didn't notice the
defendant come in, not until he closed the door.  I
turned then, glanced at him and then he fired.  He was

standing against the door, had his back turned to the door; he fired the shot immediately after he came in the door. The door closed and he shot. I was not paying attention to Fluegel at the time. I couldn't see Fluegel at the time the shot was fired; Niehaus was standing between him and me. When Niehaus came in he turned his back towards me and shot Fluegel. The defendant was about four feet from Fluegel when he shot. After the shooting we kept the defendant there. When the defendant handed me the gun he said, "I am a murderer." Niehaus did not seem to be under the influence of liquor; did not see Fluegel drinking that night.

Frank Reboe, another witness, testified to substantially the following state of facts: I live at 816 Soulard street and am a carpenter by occupation. I was in Bremer's saloon on the night of the twentieth and saw the defendant Lambert Niehaus. I never saw the man before that evening. About a quarter to twelve that evening Fluegel was sitting there asleep at the table. I was sitting at the opposite table, I and Kohl. In came Niehaus there and opened the door, says nothing, pulled out a gun out of his overcoat pocket and shoots Mr. Fluegel, and, after he did that shooting, he walked, kind of approaching Nackenhorst, and Nackenhorst takes the gun away from him. Before he gave the gun to Nackenhorst he says, "Well, I am a murderer," and he murmured something else. I thought he said, "I done what I wanted to." Fluegel was lying with his head in his right hand on the table, like this, just before the shooting, but after the shooting, for a couple of minutes afterwards, his head fell back, his hand still stayed on the table, the right hand was in his pocket. I didn't notice that his hand was not in his pocket when he was asleep. After the shooting I looked at him, saw a little streak of blood on the right side of the head. After Fluegel was shot he did not say anything, never moved

after that. I was there about three quarters of an hour, or an hour, and he was in the same position as when I came in. He was asleep when I came in and he had not changed his position. On cross-examination: When I came in Fluegel was sitting along beside the door. It was about, I judge, between two and three feet from the door. I saw Niehaus come in, saw him when he opened the door. He opened the door with his left hand; as he came in he turned around, had his right hand in his overcoat pocket, that is, when he pulled it out; turned right around and shot him. I was sitting at the opposite table facing the door when he came in. As soon as defendant got in far enough, he turned around, pulled the gun out of his pocket, drew it on Fluegel sitting there and shot him. When he came in, he did not go over into the center of the room, just turned around. I saw Fluegel immediately before the shot was fired. I was sitting facing the door when Niehaus came in and saw him come in. I paid no attention to who he was or anything else until I noticed he pulled the gun out and fired. I saw Fluegel immediately before the shot was fired, sitting in the chair, and he must have been asleep. At the time of the shooting, I judge, Fluegel was asleep, he did not move when he was shot. Niehaus said after the pistol was taken away from him, "I am a murderer."

"Q. What is the character of the people who frequent that place, if you know?

"The State renews objection as immaterial; the character of the people frequenting that saloon has nothing to do with affairs between the defendant and Fluegel.

"The objection is sustained by the court, to which ruling of the court the defendant by his counsel then and there excepted at the time."

Jacob Kress introduced by the State, testified substantially as follows: I live at 1701 South Tenth

street. I am a butcher. I know Niehaus, the defendant, as I pass him by; I knew Thomas Fluegel about the same way. I know where Bremer's place is, on Tenth and Soulard; was there the twentieth of December, when Fluegel was shot. I was there in the place. It was about twenty-five or thirty minutes to twelve and Niehaus came in the door and shot the man there sitting five or six feet from the door. Fluegel was sitting in a chair when he was shot. Fluegel was in the saloon when I came in; and was sitting in a chair during the whole time I was there. After the shooting, Niehaus walked across the saloon and said something about that he had done what he wanted to do.

Ed Bremer testified in this cause substantially as follows: My name is Ed Bremer. I stay with my brother at 923 Soulard. My brother, Gus Bremer, is proprietor of that saloon. I never saw Niehaus until the evening of the twentieth of December. I was assisting my brother in his business there. I was in the saloon that night about ten minutes before the shooting. When I came in I noticed Fluegel sleeping at the table on the west side of the saloon. He was sitting at the table. He had his hand leaning on the table, like holding his head. Niehaus came in and shot the fellow there, that was about all.

William H. McGee details the occurrence as follows: My name is William H. McGee. I live at 1516 South Tenth street. I am a broom-maker by trade. I did not know the defendant at that time. I knew Thomas Fluegel by seeing him as a waiter at the Hall. I was at Bremer's saloon on Sunday night at the time of the shooting, on the night of the twentieth of December. On Sunday evening about twenty minutes to twelve, between twenty-five and fifteen minutes to twelve, this gentleman came in the door, walked about two feet in front of this Thomas Fluegel, pulled out his gun and shot him, and just after the shot, he said, "I have got you." Mr. Nackenhorst walked up to

him, took the gun away from him and then he made
another remark, "I am a murderer," the very words
he said. When the shot was fired, Fluegel was sleeping
with his head resting on his arm, resting on the table
with his head in his hand. I went into the saloon about
five minutes to eleven o'clock, I guess. Fluegel was in
there then. He was sitting at the table, at the very
table he was shot. He was in the same position when
I came in as when the shooting was done. He never
moved nor made a budge. I was about eight feet from
Niehaus when he shot. Niehaus was a perfect stranger
to me.

Philip Kohl, another witness, testified as follows:
I live at 2106 South Ninth street. I am a gravel
worker. I was in the saloon of Gus Bremer's at
Tenth and Soulard street on the night of the twentieth
of December when Tom Fluegel was shot. I knew Tom
Fluegel, had known him about ten years. I do not
know exactly what time it was when Fluegel came in.
I think he took a glass of beer, if I am not mistaken,
then he went over to his chair, sat down and went to
sleep. I know the defendant, Niehaus. I was in the
saloon when Niehaus came in that night. I was sit-
ting along side of Fluegel, that is, he was sitting along
side of me. He was sitting back with his right hand in
his pocket, kind of leaning back, his other hand kind of
leaning on the table, like this, sound asleep. I was
sitting there talking to Reboe. He was sitting next to
me. Directly I heard the door slam; just as it did, I
looked sideways, towards Fluegel, seen the flash of a
gun; just then he shot him; so he walked over about
half ways towards the door and Nackenhorst ran out
half way between the bar and Fluegel, and says to him,
"Give me that gun," or something to that effect. He
just handed him the gun and made the remark, "I am
a murderer." After the shot was fired, Fluegel was
sitting there just as he was when he was asleep. He
never moved after he was shot. About ten or fifteen

seconds after he was shot, he kind of opened his eyes, his lids moved open a little bit. Kress walked over, looked at the man and says, "The man is dead." Fluegel was sitting, I judge, about six feet from the door when Niehaus came in, along the west wall. I was sitting north of Fluegel, Fluegel was sitting at the south table, I was sitting north of the table, Reboe was sitting north of me; same as the three of us sitting right in line. I had my right arm on the same table as Fluegel's arm was on. I was on the south side. I don't remember whether he had his hand up to his jaw or not. I looked as the door slammed, just about seen the gun at the time it went off. I saw Niehaus the day before the shooting, about four o'clock in the afternoon, in the saloon the murder occurred, in Bremer's saloon; that was about four o'clock on the nineteenth. Niehaus came in there that afternoon and he seemed under the influence of liquor. I had my back turned to him. He was there, sort of standing back of me. I forget how he made the remark, but he said, "Does Tom Fluegel ever hang out here?" A man said, "Not much; once in a while he comes around; that is, after he is through with his work; after work at the South St. Louis Turner Hall is through; he drops in after he is through with his work over there." Niehaus made the remark that he was going to get him. Niehaus was Fluegel's brother-in-law.

Malcolm Young, also a witness for the State, testified: My name is Malcolm Young. I am a police officer. On the night of the twentieth of December, 1903, I was called to the saloon of Gus Bremer, about eleven-forty-five p. m. I saw the defendant there at that time and took him into custody. I saw Fluegel there. He was sitting in a chair, about half bent over, at the southwest corner of the room. The chair was near the door; probably three or four feet from the door. He was on the south side of the table facing the east, his elbows apparently leaning over on the table.

I noticed the wound on him just above his right ear. He appeared to be dead at the time. I searched Fluegel after I returned from the station and found nothing on him. I asked the defendant the cause of the shooting. He told me it was family troubles; that was this fellow, his brother-in-law, had not treated his children right; that was the reason he shot him. He admitted the killing.

Lambert Niehaus, in his own behalf, testified substantially as follows: My name is Lambert Niehaus. I was born in St. Louis and am forty-two years old. I learned the trade of stove-moulder. Immediately before the twentieth of December I was employed on a boat out of Cairo on the Mississippi river. I knew Fluegel in his lifetime; he was my brother-in-law; married my sister about twenty years ago. My sister died last July or August. I was in the city of St. Louis at that time; worked at the World's Fair grounds. I did not board with Fluegel at that time, but I did before that. I was at Fluegel's at the time she was buried. Stayed there two nights during the week.

"Q. Did your brother at that time make any threatening remarks towards you, and if so, what were they?

"Mr. Bishop: I object to any controversy, any trouble, unless the foundation is laid for it. The circumstances that have developed so far in regard to this shooting—a man goes into a saloon and shoots another while apparently unconscious—

"Objection sustained by the court.

"The Court: The reason for sustaining the objection at this time is that there is no evidence of anything indicating self-defense in the case. This testimony is not competent unless some action on the part of the deceased—

"To which ruling defendant, by counsel, then and there excepted at the time."

After my sister's funeral, about a week afterwards, I left the city. I came back to St. Louis on the thirteenth of December, Sunday night. I saw Fluegel the following Sunday night. That was two or three days after I got back to the city. I don't remember of going to the saloon, Tenth and Soulard, Saturday night before the shooting. I heard the testimony of the last witness in regard to my saying that I would get my brother-in-law, but I don't remember of being there or of saying that. I had been drinking that week. I started to drinking Monday when I found this out.

"Mr. Bishop: I object to any testimony of his drinking or not drinking at all, anything of the kind as wholly irrelevant and immaterial. The witness was there at half past eleven, shooting in that saloon.

"The Court: I do not see how it can become material.

"To which ruling of the court the defendant, by his counsel, then and there excepted at the time."

I went there Sunday night, the night of the twentieth, the night of the killing; I was intoxicated, drinking; I went there to see him about the children.

"Q. Why did you go there to see him about the children?

"The State objects to the question as immaterial, which objection is sustained by the court. To which ruling defendant, by his counsel, then and there excepted at the time."

When I went in there, at the door, Fluegel started to raise up out of the chair. He certainly was awake. He made as though going to hit me with the chair or something. He started to pick up the chair; he did not say nothing. Then I shot him when he picked up the chair. I went in there to see him about the children; that was my intention, I didn't go in there for the purpose of doing him any harm. When he picked up the chair he tried to get up; he acknowledged me when I came in, looked around and started to get up.

His action was directed towards me when he picked up the chair. I had trouble with him the night of the funeral. He made a remark a couple of times he would get carbolic acid, put it in beer and give it to me. I had further trouble with him during the funeral. During the time his wife was lying in the house dead, he was caught in the room where she was laid out with another woman.

"Mr. Bishop: I object to that and ask it to be stricken out.

"The Court: It will be stricken out.

"Mr. Porter: We offer it as to what leads up to the difficulty between the defendant and the deceased.

"To which ruling of the court in striking out the answer above, defendant by his counsel then and there excepted at the time."

On that occasion he was hugging this woman that night. He said he would put carbolic acid in my beer.

"Q. Did you at any time hear of his making any remark about giving you a black pill? A. Yes, sir.

"Q. State when he said that? A. He said that he had a notion to go and get them, give them to me; and the two of them heard it together.

"Q. What did you understand by the remark?

"Mr. Bishop: I object to what he understood by it.

"The objection was sustained by the court. To which ruling of the court, defendant by his counsel then and there excepted at the time."

I had trouble with him several times, years back. Someone came to tell me about his going with that other woman.

"Q. Did you have any trouble with him before he made that remark, in regard to his conduct towards his wife and children?

"State objects as leading.

"Sustained by the court. To which ruling of the

court, defendant by his counsel then and there excepted at the time."

Fluegel told me, "You cannot tell me a thing about them children. I will knock your God damn head off." About three years ago he threw me down the steps, cut my wrist here with a butcher knife. We got into trouble, he asked me if I had any money. I told him I had a little; he asked me to give it to him. I would not do it, then he struck me and threw me down the stairs.

"Q. On the occasion when you had the conversation with the deceased, Fluegel, when he said he would knock your head off, I will ask you to state again what the subject of the conversation was, what led up to his saying he would knock your head off?

"Mr. Bishop: I object to that as he has already given his version of it. The objection is sustained by the court. Defendant excepts."

Cross-examination: I am forty-two years of age. My sister, Fluegel's wife, was older than I am, three or four years. Fluegel was forty-nine or fifty at the time of his death. I learned the trade of stove-moulder, but I have not been following it lately. I worked at Filley's Foundry, Twenty-first and Market streets, twelve or fourteen years ago. I do not know that that foundry has not run for over twenty years.

"Q. After you quit stove moulding, what did you do?

"Mr. Porter: I object, as it was not entered upon in the examination in chief.

"Mr. Bishop: I want to show his story is untrue. I want to cross-examine him.

"Mr. Porter: I object to showing consecutively what the defendant has done for the past year. ,

"The Court: To know where he was.

"To which ruling of the court defendant by his counsel then and there excepted at the time."

On the night of the twentieth of December last, I

·was looking for Fluegel in regard to the children. I did not go into the saloon to find him. I had gone there to see him, to speak to him. I did not know he was in there. I had no idea of seeing him in there. I do not remember being at that saloon on Saturday night. I went in this door at the corner. When I got inside of the door, I saw·Fluegel, he saw me after I came in. I should judge he was eight feet from the door. He was sitting down in a chair, one hand on the arm of the chair and one on the table. Just as soon as I got there he started to get up, had his hand on the table, and one hand on the chair. He just about got off the chair, I guess, when I shot. He started to raise up as soon as he saw me, just about started to get up. I thought he was going to pick up the chair.

''Q. What motion did he make to indicate it? A. The way he looked at me I had an idea he was going to pick the chair up. I had my pistol in my coat pocket when I went in there. He was not looking at me when I shot him; he saw me and started to get up. When I fired, he was about in this position, one hand on the table, the other on the arm of the chair about to rise. I had time enough to get the pistol, level it at him and fire before he left the chair. I made a short statement before the coroner on the twenty-second day of December, the Tuesday after the shooting. I made it voluntarily.

''Q. You did not say a word there about this man rising from his chair, starting to rise from his chair, did you? A. Just simply told them I shot him on account of these children.

''Q. You did not say a word there about this man rising from his chair, starting to rise from his chair, did you? A. No, sir, I never said a word about that.

''Q. How long had you been carrying a pistol?

"Mr. Porter: I object to that as immaterial, how. long he had been carrying a pistol.

"The Court: Not generally 'a pistol.'

"Q. I will say that pistol, the pistol you used on that occasion?

"Defendant's counsel object to the question as immaterial, which objection is overruled by the court. Defendant excepts.

"A. I have been carrying that about three months."

Defendant introduced testimony as to his good reputation. One of the witnesses testifying for defendant, after giving testimony as to his good reputation, stated that he was at the house when deceased's wife was lying dead. This witness stated that he had heard the deceased at that time make a remark that he would like to give that man, referring to the defendant, a black pill.

At the close of all the evidence, the court instructed the jury upon murder of the first degree, self-defense, upon the subject of reasonable doubt, and good character, fully covering every feature of the case to which the testimony was applicable. The case was submitted to the jury and they returned a verdict of guilty of murder of the first degree.

Sentence and judgment were entered in accordance with the verdict, from which judgment the defendant prosecuted this appeal, and the cause is now before us for consideration.

OPINION.

The record in this cause presents for our consideration a very serious as well as an important case. Its importance does not arise from any complicated legal propositions, presented in the record, but from the nature and character of the charge with which we are to deal, and the realization of the fact that the life of a citizen is involved.

Counsel for appellant urge as reasons for the reversal of this judgment:

1. That the indictment only charges the defendant with manslaughter, and fails to properly charge him with murder of the first degree, of which offense the defendant was convicted.

2. That the trial court committed error in refusing the request of appellant praying it to instruct the jury upon the law as to murder of the second degree.

3. That the court at the trial of this cause admitted illegal and incompetent evidence offered by the State and excluded legal and competent evidence offered by the defendant.

Upon the first proposition, in which the validity of the indictment is challenged, counsel for appellant does not direct our attention specifically to any defects of the indictment upon which his contention is predicated. From the cases cited to support the assignment of error, it must be inferred that the complaint of appellant is directed to the concluding paragraph of the indictment. Our attention is directed to the cases of State v. Cook, 170 Mo. 210; State v. Furgerson, 152 Mo. 98; and State v. Meyers, 99 Mo. 115, as maintaining the contention that the indictment in this cause simply charges manslaughter and not murder. An examination of the cases cited disclose that the defects in the indictments in those cases consisted of the omission of the proper and essential allegations in concluding the indictment, that is, "that the grand jurors aforesaid, upon their oaths aforesaid, do say," etc. An inspection of the indictment in this case makes it apparent that no such omission was made as in the cases cited by counsel for appellant.

The form of the indictment in this cause has uniformly met the approval of this court, and the conclusion wherein it is alleged, "And so the grand jurors aforesaid, upon their oath aforesaid, do say that the said Lambert Niehaus, the said Thomas Fluegel in the

manner and form, and by the means aforesaid, feloniously, wilfully, deliberately, premeditatedly and of his malice aforethought, did kill and murder; contrary to the form of the statute in such case made and provided, and against the peace and dignity of the State," fully meets the requirements of the test announced in the cases to which our attention has been directed.

It is next insisted that the refusal of the court to instruct the jury upon murder of the second degree, constitutes error. We are unable to give our assent to this contention; in fact, we cannot do so unless we are willing to ignore the uniform expressions of this court upon the subject of instructions from its earliest history to the present time.

It is fundamental that instructions must be predicated upon the facts developed at the trial, and it has been repeatedly ruled by this court in cases of this character, that the instructions to the jury by the trial court should be confined to those grades of the offense to which the testimony in the cause is applicable.

The grave and serious consequences resulting from the charge and conviction of the offense presented in this record, have led us to a very careful consideration of the testimony upon which this judgment rests, as disclosed by the record. A careful analysis of it discloses an entire absence of even a scintilla of evidence which would have warranted the court in submitting to the jury, by instructions, any lesser grade of the offense than the one of which he was convicted.

To reduce a homicide from murder of the first degree to murder of the second degree or to manslaughter, there must be some conduct or action on the part of the deceased reasonably calculated to arouse passion on the part of the slayer. There is absolutely no evidence disclosed in the record before us which, in any manner, indicated at the time of the homicide such lawful, reasonable or just provocation as would reduce the grade of the offense from murder of the first to murder

of the second degree or to manslaughter.  [State v. Ellis, 74 Mo. 207; State v. Gurley, 170 Mo. 429; State v. Kotovsky, 74 Mo. 249; State v. Furgerson, 162 Mo. 668; State v. Reed, 162 Mo. 312.]

The testimony of the defendant indicates no passion whatever and his testimony fails to show a single utterance on the part of the deceased, at the time of the killing, which was calculated to arouse in the defendant any sort of heat of passion; in fact, the defendant does not claim that the deceased said anything to him at the time he shot him.

There was no error in refusing the request of defendant to instruct the jury upon murder of the second degree.

This leads us to the only remaining question presented by counsel for appellant; that is, as to the erroneous admission and exclusion of evidence during the progress of the trial.  Upon this question, we have undertaken to indicate substantially the action of the court during the progress of the trial, in respect to its rulings upon the admission and exclusion of evidence. A careful consideration of the disclosures of the record convince us that there is no merit in the contention that either incompetent evidence was admitted or that competent evidence was excluded upon the trial of this cause.  In fact, the record discloses that great latitude was allowed the defendant and the rules of evidence liberally construed in his interest in the presentation of his defense to this grave charge preferred against him.  The testimony excluded by the court, such as the defendant's reputation for industry, his being intoxicated, certain incidents occurring months before at the time of the death of the wife of deceased, the character of the people who frequented the saloon where the homicide was committed, and other incidents, absolutely furnished no defense to the charge against the defendant, neither did it tend to prove or disprove any of the

issues involved in the case, and the action of the court in excluding it was proper.

We have thus reviewed the suggestions of error made by the appellant. It is seldom a record reaches this court about which so little complaint can be made. There were six witnesses present at the shooting of Thomas Fluegel, which resulted in his death, and their testimony is in perfect harmony upon the material details as to how this tragedy occurred. The substance of the testimony of all these witnesses may well be embraced in the simple statement "that defendant walked into the saloon of Mr. Bremer and found the deceased sitting by a table asleep, and without a murmur or utterance of any kind on the part of the deceased, shot him to his death." If the testimony of these six witnesses are to be believed, and none of them were impeached, then there is no escape from the conclusion that this was wilful and deliberate murder, without the slightest provocation.

The defendant testifies in his own behalf, and while his version of the killing contradicts all the other witnesses, yet it must be confessed that, giving his testimony full force and its broadest scope, there is still a very narrow margin upon which to predicate an instruction of self-defense. However, he was given the full benefit of such defense, which at least serves to emphasize the fair and impartial trial awarded the defendant, as is fully disclosed by the record.

It can serve no useful purpose to reproduce the instructions given by the court upon the trial of this cause; however, we have not been unmindful in giving them proper attention and careful consideration. They are such as have repeatedly met the approval of this court. They were extremely favorable to the defendant, fairly and fully presenting every legal aspect of the case to which the testimony was applicable, and there is no legal ground upon which any complaint against them can properly rest.

Defendant was represented by counsel, who fully presented his case to the jury in the trial court, and who, as evidenced by the record, carefully preserved the action of the trial court upon all matters affecting his client's interest, and finally presented the record for review by this court; hence it can appropriately be said that upon the defendant alone, by reason of his wrongful act, must rest the entire responsibility for the grave and serious consequences resulting from this prosecution.

The jury heard the testimony in this cause. It was their province to determine the guilt or innocence of the defendant; their finding is fully supported by the evidence, and there is nothing left for this court to do except to follow the law, which results in the affirmance of the judgment, and the order that the sentence of the law be executed.

*Gantt, J.,* concurs; *Burgess, P. J.,* absent.