## EL PUEBLO *v.* LASSALLE.

APELACIÓN procedente de la Corte de Distrito de San Juan, Sección Segunda.

No. 423.—Resuelto en mayo 24, 1912.

DERECHO PENAL—CONFESIÓN DEL ACUSADO—REQUISITOS DE LA CONFESIÓN.—La confesión hecha libre y voluntariamente por un acusado es un elemento probatorio de la mejor clase y por lo tanto admisible como prueba de la comisión del delito.

ID.—CONFESIÓN DEL ACUSADO.—Examinada la confesión del acusado en este caso se resolvió que reunía los requisitos necesarios para su validez y admisión como prueba.

ID.—CONFESIÓN DEL ACUSADO—PRESENCIA DE TERCEROS.—El hecho de que un acusado haga confesión de su crimen ante el Fiscal y en presencia de un oficial de la detective y un periodista, no le quita a dicho acto, por ese mero hecho, la espontaneidad necesaria para que la confesión produzca efectos legales.

ID.—CONFESIÓN DEL ACUSADO—PETICIÓN PARA HACERLA—JURAMENTO Y FIRMA DEL ACUSADO.—No es un elemento necesario para la validez de una confesión el que conste que el acusado pidió permiso para hacerla. Tampoco es requisito el que esté firmada y jurada por un acusado. Una confesión verbal es completamente válida.

ID.—CONFESIÓN DEL ACUSADO—PRISIÓN DEL ACUSADO.—La confesión hecha por un acusado, que está extinguiendo condena en el presidio, y bajo una acusasión de un delito capital, es admisible como prueba en contra de él, cuando aparece que ha sido hecha voluntariamente y no por medio de amenazas o promesas.

ID.—INSTRUCCIONES AL JURADO—INTERPRETACIÓN.—Es un principio general de derecho que las instrucciones al jurado deben interpretarse en su totalidad y no en párrafos aislados e independientes, y al interpretarlas debe tenerse en consideración la prueba aducida al juicio y que sirve de base a las instrucciones.

ID.—INSTRUCCIONES AL JURADO—PREMEDITACIÓN—DELIBERACIÓN.—Cuando el juez en sus instrucciones al jurado sin definir en particular los términos premeditación y deliberación, se expresa en términos generales de tal modo que comprenda ambos conceptos, dichas instrucciones son suficientes y ajustadas a derecho.

ID.—PREMEDITACIÓN Y DELIBERACIÓN.—Estos dos conceptos son examinados y estudiados en la opinión.

ID.—DELIBERACIÓN—ASESINATO EN PRIMER GRADO.—La premeditación y deliberación son elementos esenciales del delito de asesinato en primer grado, pero la deliberación no lo es del de asesinato en segundo grado.

ID.—INSTRUCCIONES ERRÓNEAS Y AL MISMO TIEMPO FAVORABLES AL ACUSADO—ERRORES SIN IMPORTANCIA.—Constituyen errores sin importancia aquellos que comete un juez en las instrucciones al jurado explicando las disposiciones legales en un sentido más favorable para el acusado de lo que justifica la prueba aducida al juicio y no producen la anulación de la sentencia apelada.

ID.—INSTRUCCIONES AL JURADO—PRUEBA DE ASESINATO EN PRIMER GRADO.—No constituye error el dejar el tribunal de instruir al jurado acerca de los preceptos legales que rigen el delito de asesinato en segundo grado, cuando la prueba demuestra únicamente la comisión de un delito de asesinato en primer grado.

Los hechos están expresados en la opinión.

Abogado del apelante: *Sr. Jacinto Texidor.*

Abogado del apelado: *Sr. Charles E. Foote, Fiscal.*

EL JUEZ ASOCIADO SR. MACLEARY, emitió la opinión del tribunal.

En este caso el acusado fué declarado culpable del delito de asesinato en primer grado y condenado a la pena de muerte. La acusación está bien redactada y en ella se acusa a José Lassalle Hernández de haber dado muerte a Francisco Santiago, bajo circunstancias constitutivas del delito de asesinato en primer grado. Cuando se cometió el delito en 15 de enero de 1911, tanto el acusado como el interfecto eran presidiarios extinguiendo condena en la penitenciaría insular de San Juan.

Los hechos brevemente expuestos son los siguientes: En la mañana del día fatal Francisco Santiago a eso de las diez, se quejó a un compañero de presidio llamado Miguel Guadalupe, el cual era cabo en el penal, del acusado que también era cabo, porque éste lo trataba mal, prohibiéndole que hablara con otros presidiarios, tratándolo como si fuera una mujer, estando celoso de él, y que el citado Santiago estaba ya can-

sado de ese trato. Guadalupe posteriormente, al mediodía, le informó a Lassalle de la queja de Santiago. El acusado negó que fuera verdad lo que había dicho el interfecto. Por la noche, cuando el acusado entró en guardia, se acercó a la reja de la zapatería y con un palo con ganchos cogió la cadena que sostenía una chaveta y de ese modo se apoderó de dicho instrumento y como a las once de la noche fué a la sastrería, en donde dormía Santiago con otros presidiarios. Primero se dirigió a la mesa en donde dormía uno llamado ''Cagüeño'' lo miró y siguió hasta donde yacía Santiago durmiendo al parecer. Lo agredió con la chaveta, el cual gritó: ''Oh, me han matado.'' La víctima se levantó y cayó sentada, siendo agredida por el acusado tres veces más. Mientras esto sucedía los que estaban alrededor se despertaron. Llegaron varias personas y desarmaron al acusado quien trató de suicidarse haciéndose varias heridas. Santiago murió a los pocos momentos de resultas de las heridas que le causó el acusado. Este fué llevado al hospital del presidio. La acusación fué presentada prontamente y en noviembre último después de un juicio por jurado, el acusado fué declarado culpable y condenado a la pena de muerte. Se interpuso recurso de apelación y oportunamente se presentó en esta corte la transcripción de autos. Careciendo de abogado defensor, el tribunal de oficio designó a un distinguido letrado que lo defendiera ante este tribunal. Se celebró la vista y se hicieron alegaciones orales y escritas, habiendo quedado el caso sometido a nuestra consideración el 7 del presente mes.

Cinco son los errores que constituyen los fundamentos del recurso y que se suponen cometidos por el tribunal sentenciador en perjuicio del acusado. Expuestos por orden correlativo son los siguientes:

''1. El apelante sostiene que en el presente caso objeto de este recurso, la confesión del acusado fué indebidamente admitida con perjuicio de los derechos esenciales del acusado.

"2. Se tomó declaración al acusado sin tener en cuenta las disposiciones legales.

"3. El abogado defensor del acusado alega que el tribunal inferior cometió error en las instrucciones que dió al jurado con perjuicio de los derechos esenciales del acusado.

"4. La Corte de Distrito de San Juan cometió error al instruir al jurado, considerando una cuestión que había sido excluída de la consideración del jurado.

"5. El abogado del acusado sostiene que el tribunal en sus instrucciones al jurado dejó de explicar los conceptos de premeditación y deliberación para que pudieran ser tomados en consideración por el jurado."

Los anteriores errores pueden clasificarse en dos clases:

1ª. Que la confesión del acusado no debió haber sido admitida como prueba.

2ª. Que las instrucciones dadas por la corte al jurado fueron impropias y perjudiciales a los derechos del apelante.

La confesión del acusado dice lo siguiente:

"Ante el Fiscal en la enfermería del presidio, declara José Lassalle Hernández, el que juramentado en forma y después de enterado de su derecho de abstenerse de declarar, renuncia a él y de que esta declaración podrá ser utilizada en su contra declara:

"Que conoció en Aguadilla a Francisco Santiago; que harán como dos meses ingresó en el presidio y reanudaron las amistades; que el viernes subió a la enfermería de donde bajó ayer domingo: que fué reprendido por el cabo de patio Miguel Guadalupe manifestándole que Francisco Santiago le había dicho que el declarante le prohibía hablar con los demás en la barbería; que eso ocurrió como a las 10 de la mañana; que por eso y por la amistad que tenía con Francisco le dió un gran sentimiento, pues lo juzgaba como a una persona maliciosa, es decir, que creían tenía amores con Francisco, al llegar la noche, girando de imaginaria, se aproximó al rastrillo del taller de zapatería y con la vara aló la cadena que tenía sujeta la chaveta; que se apoderó de ella y se acercó a Francisco que se encontraba en la cama y lo vió con los ojos cerrados, que no sabe si lo vió, pero cree estaba despierto porque se acababa de acostar, y le tiró con la chaveta,

y entonces Francisco brincó y cayó sentado tirándose el declarante tres chavetazos; que en el acto se levantaron los más cercanos.

"Leída que hubo esta declaración la firma por ser lo manifestado.

(Firmado)     José Lassalle.

"Testigo:   (Firmado)     Pedro G. Goico.

"Jurada y suscrita ante mí hoy 16 de enero, 1911. Firmado. Luis Campillo, Fiscal de Distrito."

La cuestión que se nos presenta es si esta confesión fue legalmente admitida de acuerdo con los preceptos legales, o si su admisión fué perjudicial a los derechos del apelante. La confesión hecha por un acusado libre y voluntariamente constituye prueba de la mejor clase. Tal confesión es digna de todo crédito por presumirse que es el resultado de un sentimiento profundo de culpabilidad y es admisible como prueba de la comisión del delito que se confiesa. Aunque por la naturaleza misma de las confesiones éstas deben ser cuidadosamente escudriñadas y aceptadas con gran cautela antes de ser admitidas como prueba, sin embargo, una confesión voluntaria y deliberada está considerada por los mejores tratadistas como uno de los medios más eficaces en derecho procesal y constitutivo de la prueba más fuerte de los hechos narrados en la confesión contra la persona que la hace. (*Sparf* and *Hansen* v. *United States,* 156 U. S., 55.)

Es un principio generalmente aceptado que para que una confesión sea admisible como prueba contra el que la hace, debe ser libre y voluntaria. ¿Fué la confesión del acusado en el caso de autos de esa naturaleza? La confesión fué hecha al Fiscal bajo juramento, después que al acusado se le informó del derecho que tenía para abstenerse de confesar. El renunció a ese derecho. También se le informó que cualquier confesión que hiciera podría ser utilizada en contra de él, y a pesar de eso prestó la declaración jurada. Después de escrita la confesión por el Fiscal, dictada por el acusado, le fué leída y fué firmada y jurada ante dicho funcionario y certificada por él. Ese documento también fué firmado por

el testigo, Pedro G. Goico, reporter de un periódico que se encontraba presente. El teniente Quiñones, oficial de la policía secreta, también presenció el acto de la confesión, pero su nombre no consta como testigo del documento.

El abogado del apelante sostiene que en tales circunstancias la confesión carecía del elemento de espontaneidad que exige la ley para que pueda utilizarse contra el acusado en el acto del juicio. No encontramos nada en nuestras leyes que apoye esta teoría y el ilustre abogado defensor no nos ha citado jurisprudencia alguna que la sostenga. Si hubiera habido alguna, el abogado con su celo e ingenio indudablemente que la habría presentado. Aunque el detective y el reporter se encontraban presentes al hacerse la confesión, no hay nada que muestre que ellos tomaran parte en el procedimiento, exceptuando solamente el hecho de haber éste último firmado el documento como testigo. Esto era innecesario pero enteramente inofensivo. Si la confesión se hubiera hecho en corte abierta a presencia del juez, del jurado, marshal y de toda la corte y ante una fila completa de reporters que hubieran ido tomando palabra por palabra a medida que salían de los labios del acusado, aun en ese caso hubiera sido voluntaria y siendo así era admisible como prueba.

Pero el abogado alega que en los autos no aparece nada que muestre que el acusado solicitó que se le permitiera hacer la confesión, e insiste en que tal solicitud es necesaria para que dicha confesión sea válida. No entendemos así la ley, pero pudiera deducirse de las palabras con que empieza el documento, que fué tomado a petición del mismo si así era necesario hacerlo; pero no aparece tampoco que alguna persona le sugiriera o persuadiera a que hiciera alguna declaración o confesión. Por el contrario se le informó que si hacía alguna manifestación, la misma podría ser usada en su contra cuando llegara el juicio. Esto no obstante, insistió debido a razones de conveniencia para él en hacer la manifestación y ratificarla por medio de su juramento, y firma en presencia de testigos. Una mera declaración oral sin la sanción de un juramento

puede usarse como prueba contra la parte que la hace cuando llega el momento del juicio, por consiguiente, aunque en este caso se observaron las mayores formalidades que tendían al esclarecimiento de la verdad y a demostrar el carácter voluntario del acto, sin embargo, eran necesarias para dar validez a la confesión.

Además, aparece de la declaración de Quiñones, que el Fiscal manifestó al acusado que no tenía obligación de prestar declaración, pero podía hacerlo o nó según le conviniera y que el acusado hizo su confesión sin que mediara ninguna amenaza o promesa. Y el testigo Goico declara que el Fiscal informó al prisionero que podía o nó declarar según le conviniera, contestando Lassalle que estaba dispuesto y quería prestar su declaración. Resulta de las manifestaciones de estos testigos que la confesión fué evidentemente voluntaria y tomada de acuerdo con todas las formalidades y garantías.

La destreza e imparcialidad desplegadas por Luis Campillo, Esq., al tomar esta declaración escrita al acusado, merece gran encomio y es digna de ser imitada por otros funcionarios en iguales circunstancias.

Al hacer el acusado su confesión se encontraba detenido en la enfermería del presidio, sabía que se le imputaba la comisión del delito y confesó ante el Fiscal del distrito, persona que ejercía autoridad sobre él y ante un teniente de la detective que también en aquel momento se podría considerar que ejercía autoridad sobre el prisionero. Pero estos hechos por sí solos sin que aparezca que fué obtenida por medio de alicientes o amenazas, no la invalidan y no la hacen inadmisible en evidencia.

Las confesiones hechas por cualquier persona aunque se encuentre en prisión y en cadenas por virtud de una acusación de pena capital, son admisibles como prueba contra él con tal que aparezca que fueron hechas voluntariamente y no se obtuvieron por medio de amenazas. (*Pueblo* v. *Kent,* 10 D. P. R., 343, en donde se cita el caso de *Sparf* and *Hansen* que se encuentra en 156 U. S., 58; y el caso de *Pierce* en 160

U. S., 357.  Véase también el de *El Pueblo* v. *Rivera (a) Pan-chito,* 9 D. P. R., 505, y *El Pueblo* v. *Morales (a) Yare-Yare,* 14 D. P. R., 234.  Y el caso de *Alméstico* recientemente fallado. Véase además el tomo 12 de Cyc., 462, y casos allí citados.)

Por consiguiente, debemos resolver que la confesión del acusado en este caso, habiendo sido hecha espontánea y volun-tariamente y sin que mediara influencia alguna de amenazas o promesas, y a falta de intimidación o persuasión, fué debida y legalmente admitida como prueba en contra del mismo al celebrarse el juicio.

Por tanto, llegamos ahora a la discusión de la instrucción dada por la corte al jurado.  Ni el Fiscal ni el acusado solici-taron de la corte ninguna instrucción.  ¿Contenían las instruc-ciones de la corte alguna proposición u observación que fueran indebidas o perjudiciales a los derechos del acusado, según ha sido alegado por el abogado en su alegato y en su informe oral hecho en el acto de la vista?

El apelante alega que la corte sentenciadora cometió va-rios errores que fueron perjudiciales a los derechos del acu-sado en sus instrucciones al jurado.  La corte en sus instruc-ciones al jurado hizo un resumen de la prueba empezando con la declaración de los peritos médicos y al examinar la prueba de los otros testigos, dice: "Ahora viene la declaración de los confinados del presidio que eran los únicos que se encontraban presentes cuando se realizó el crimen   *   *   *."

Estas palabras han sido tomadas por el apelante como significativas de que la corte quiso decir al jurado que todos los testigos del presidio que declararon en el juicio, eran tes-tigos oculares del delito.  Pero esta manifestación del juez no debe ser considerada separadamente.  Es un principio bien conocido y creemos que no es necesario citar autoridades, que las instrucciones deben considerarse conjuntamente y no en sus párrafos independientes y que una instrucción debe inter-pretarse con relación a la prueba en que la misma se funda. Aparece de la prueba que cinco confinados del presidio decla-raron, pero que únicamente uno de ellos Ezequiel Ponce, vió

la comisión del crimen. La corte hace un resumen de todas las declaraciones con gran cuidado y exactitud y sin omitir ningún detalle importante con referencia a lo declarado por ellos.

La corte en sus instrucciones al jurado con respecto a la prueba no cambia los hechos en manera alguna, apareciendo claramente del resumen que de ella hizo, que Ezequiel Ponce fué el único testigo que vió a Lassalle asestar el golpe mortal sobre Santiago, no encontrándose presentes los demás testigos en aquel momento. La corte al hablar sobre la prueba establece una distinción entre los testigos, o sea entre el perito médico Dr. López Antongiorgi que fué llamado de afuera del presidio para asistir al herido, y los testigos que se encontraban en el presidio cuando el crimen se cometió. Se refiere a los últimos, no como testigos presenciales sino como individuos que se hallaban presentes dentro del penal cuando el hecho ocurrió. Leyendo las instrucciones en conjunto, esta es la única interpretación que cabe darse a las palabras de la corte; no han podido llevar confusión al jurado y no existe error alguno en ellas que pueda ser considerado perjudicial al acusado.

Pero aun cuando la corte inadvertidamente hiciera referencia a todos los compañeros de penal del acusado como testigos presenciales de la muerte, cuando en realidad solamente uno de ellos había presenciado dicha muerte, esto era una inexactitud del lenguaje, que debe considerarse como insignificante e inmaterial si se examina en relación con el hecho de que la corte comentó clara y detalladamente las declaraciones de tales testigos, así como también por separado cada una de ellas, corrigiéndose así cualquiera impresión indebida que haya podido formarse en la mente de algún jurado, con respecto a la presencia o ausencia de algún testigo en el sitio de la tragedia cuando la misma se desarrolló.

Alega el apelante que la corte cometió un error en sus instrucciones al jurado, porque refiriéndose a la declaración del testigo Miguel Guadalupe dijo que este testigo le había mani-

festado que Santiago le había dado la queja de que Lassalle
le hizo ciertas *proposiciones inmorales,* cuya frase no usó
Guadalupe y que con esta frase la corte hace con respecto a
Lassalle una inculpación grave que necesariamente tenía que
influir en el ánimo del jurado.   La corte dijo al jurado en sus
instrucciones refiriéndose a la declaración del testigo Guada-
lupe, lo siguiente:

"Viene el testigo Miguel Guadalupe y declara ante vosotros que
él estaba en la barbería afeitándose, y que se le presentó allí Santiago
diciéndole que éste hombre, José Lassalle, le hizo ciertas proposiciones
inmorales; que él estaba ya cansado de eso, y lo ponía en su conoci-
miento."

El testigo, Miguel Guadalupe, declaró lo siguiente:

"Que el día 15 por la mañana, después de haber hecho la limpieza
del patio, fué a la barbería a afeitarse y le dijo Francisco Santiago
que José Lassalle lo estaba maltratando a él, porque le estaba pro-
hibiendo que hablara con los otros compañeros, tratándolo como si
fuera una mujer.   Repreguntado por la defensa, manifiesta que Fran-
cisco Santiago le dijo que José Lassalle le prohibía que conversara
con los compañeros, y lo celaba, por lo cual reprendió a José Lassalle
y le dijo que si seguía con esas cosas, lo reportaría a adentro.   Que
cuando reprendió a Lassalle por esos hechos, él negó que fueran cier-
tos; que no se incomodó.   Que Francisco Santiago no le había dado
ninguna queja con anterioridad sobre eso, ni había tenido ninguna
otra queja contra el acusado.   Preguntado por el juez, dice: que no
tenía conocimiento personal de que fuera cierto el proceder del acu-
sado; lo supo por la queja.   Que él se veía con Santiago como a las
dos del día, y el hecho fué por la noche del mismo día.   A preguntas
de la defensa manifiesta: que no dió crédito a las inculpaciones que le
hizo Santiago de Lassalle."

Si el testimonio de Guadalupe algo quiere decir, ello es
que Santiago le manifestó que Lassalle le hizo proposiciones
inmorales, y que ya estaba cansado del tratamiento que de él
recibía.   El juez de ningún modo hace inculpación con res-
pecto al acusado y nada de lo dicho por él en las instrucciones
pudo fundar una creencia en la mente de los miembros del
jurado, de que el juez de la corte había ya formado opinión

·con respecto a las condiciones morales del acusado; él se limitó a expresar lo declarado por el testigo, y lo mismo que manifestó el testigo el juez dijo en otras palabras al jurado.

Las observaciones hechas por el juez sentenciador con respecto a la declaración de Miguel Guadalupe estaban autorizadas por el estatuto y eran completamente imparciales para el acusado, las que en manera alguna pudieron empeorar su situación ante el jurado. Toda la prueba fué debidamente presentada al jurado, al que se dieron las siguientes instrucciones:

"De modo que, juzgando por el resultado de la prueba practicada, si vosotros creeis que esos testigos han dicho la verdad, y que todos esos testigos, declarando cada uno separadamente, han demostrado plenamente todos los elementos de la acusación; y vosotros dais al testimonio de esos testigos todo el grado de credibilidad necesaria, vosotros entonces, cumpliendo con vuestro deber, deberán traer un veredicto de culpabilidad en cualquiera de los grados que crean. Si vosotros creeis que las declaraciones de esos testigos no merecen crédito alguno, y que no han sido probados en ningún modo los elementos de esta acusación, entonces es deber de vosotros darle al acusado el beneficio de la duda razonable y traer un veredicto de inculpabilidad."

Resulta claramente que las declaraciones de los testigos se sometieron debidamente a la consideración del jurado, los que tenían que resolver acerca de la credibilidad y la suficiencia de las mismas para fundar en ellas un veredicto de culpabilidad. Por tanto, la instrucción de la corte fué correcta por lo menos en aquellos particulares que ahora alega el abogado.

Pero la oposición que principalmente hace el abogado con respecto a las instrucciones de la corte es la que se refiere a la debida definición de lo que constituye "premeditación" y "deliberación"; y especialmente a la omisión de la corte de dar al jurado una instrucción explicándole de modo claro y exacto la significación de la palabra deliberación en relación con el delito de asesinato. Debe tenerse presente que tal instrucción no fué solicitada por el abogado del acusado en el acto del juicio. El distinguido abogado que representa al

apelante ante este tribunal no intervino en el juicio de esta causa en la corte sentenciadora.

La instrucción de la corte con respecto a este particular es como sigue:

"De modo que esta acusación imputa un delito de asesinato en primer grado, y es necesario que sepamos lo que es un delito de asesinato en primer grado. La ley lo define en término generales, diciendo que es la muerte ilegal de toda persona, con malicia premeditada. Malicia premeditada: Por malicia se entiende todo acto ilegal, hecho intencionalmente, sin causa o excusa para ello; pero esta malicia no basta por sí sola para constituir el delito, sino que es necesario además que sea premeditada. De modo que, para que este delito de asesinato exista, es necesario que la malicia sea premeditada. Premeditar, es resolver, ejecutar un acto con anterioridad a la comisión del delito. Si nace en nuestra mente una idea que nos lleva a la comisión de un acto, después de haberlo pensado, de haberlo meditado, de haberlo deliberado, y después de haber resuelto su ejecución, eso es premeditación; pero es necesario además que esa malicia premeditada vaya acompañada de otras circunstancias para que sea asesinato en primer grado, y esas circunstancias son las que define la Ley en su artículo 201 del Código Penal. Este artículo dice así: 'Todo asesinato perpetrado por medio de veneno, acecho o tortura, y toda clase de muerte intencional, deliberada y premeditada, o cometida al perpetrarse algún incendio, violación, robo, escalamiento o mutilación, constituye asesinato en primer grado, siendo de segundo grado todos los demás.' De modo que este artículo de la ley es el que determina los elementos necesarios para constituir el delito de asesinato en primer grado, y se pueden dividir en tres grupos distintos: primero, todo asesinato perpetrado por medio de veneno, acecho o tortura; segundo, toda clase de muerte intencional, deliberada y premeditada, y tercero, toda muerte cometida al perpetrarse algún incendio, violación, robo, escalamiento o mutilación. De manera, que ni el primero y tercero es el objeto de la acusación Fiscal; pero sí el segundo, es decir, toda muerte deliberada y premeditada. El asesinato en segundo grado exige también la malicia premeditada, pero no contiene ninguno de estos requisitos del artículo 201. De manera, que porque se acuse a un individuo de haber cometido un delito de asesinato con malicia premeditada, no significa esto que sea asesinato en primer grado; puede serlo de segundo grado."

La instrucción con respecto a este particular se extiende

más de lo necesario al definir la palabra premeditación y habiendo el juez explicado extensamente esa palabra, pudo también haber explicado o haber definido debidamente y de modo más explícito la palabra deliberación y haber apreciado la distinción que existe entre ellas.   Pero no apareciendo que ésto hubiera sido solicitado, debe considerarse que no fué un error esencial.

La corte instruyó al jurado que la *malicia premeditada* es elemento esencial a todo asesinato, sea de primer grado o de segundo grado; pero para ser constitutiva de asesinato en primer grado la muerte tiene que ser intencional, deliberada y premeditada.   No explicó la corte el significado de la palabra deliberación, pero dió instrucciones respecto a la *malicia premeditada* que correctamente expresan y comprenden ambas ideas, la premeditación y la deliberación; esto es suficiente, y no es necesario explicar los dos términos separadamente.

En un caso de North Carolina, el Juez Sr. Hoke de aquel Estado trata esta cuestión con tal claridad y habilidad, que debe permitírsenos que copiemos extensamente de su opinión, según aparece en las páginas 283 a la 288 del 50 Southeastern Reporter, en donde se dice:

"Además, se ha sostenido que las instrucciones son erróneas, porque mientras explicando al jurado el significado de la 'premeditación,' la corte no explicó el término 'deliberación,' ambas palabras estando empleadas en el estatuto definiendo el crimen de asesinato en primer grado.' Pero a nuestras mentes las instrucciones no están abiertas a este ataque.   El juez dijo al jurado, entre otras cosas, sobre esta cuestión: ' La palabra 'premeditación' quiere decir pensar de antemano, como cuando un hombre piensa respecto la comisión de un acto, y concluye y determina en su mente cometer el acto.   El entonces ha premeditado la comisión del acto.   La ley no da regla alguna respecto al tiempo que debe transcurrir entre el momento cuando una persona premedita o llega a una determinación en su mente de matar a otra persona y el momento cuando él realiza el acto de matar.   No es cuestión de tiempo.   Es meramente una cuestión de si el acusado ha formado o nó en su mente la determinación de matar al interfecto, y entonces algún tiempo posterior, inmediato o remoto lleva a efecto su determinación, previamente formada, matando al

interfecto. Si existe una intención de matar y el acto de matar ocurre simultáneamente, entonces no hay premeditación. Si el prisionero pensó el propósito de matar bastante tiempo para formar un designio fijado de matar, y a un tiempo posterior, no importa tan seguido o tan remoto, lo puso en ejecución, había suficiente premeditación para justificar al jurado en presentar un veredicto de asesinato en primer grado. Los dos términos 'deliberación' y 'premeditación,' mientras frecuentemente usados en esta conexión indistintamente, porque quizá los hechos requieren que se deba referir a ellos separadamente, no tiene exactamente el mismo significado. 'Premeditar' envuelve la idea de anterior consideración, mientras 'deliberar' más bien indica reflexión, el pesar las consecuencias del acto con más o menos calma. Pero si las instrucciones del juez están redactadas en palabras que expresan ambas ideas, y que completamente las explican al jurado, son correctas, aunque el juez no haya definido cada término separadamente. (*Lang* v. *State*, 84 Ala., 1; 4 South., 193; 5 Am. St. Rep., 324.) En las instrucciones que tenemos delante, el juez dió una explicación ámplia de ambas palabras del estatuto definiendo el crimen. El excluyó toda idea de una muerte por pasión súbitamente nacida, y ordenó al jurado, que antes de condenar por el crimen más alto, que la muerte debía resultar de una determinación fija, previamente formada, después de pesar la cuestión. Tales son los requisitos de la ley respecto de esta cuestión y es bien sostenida por la jurisprudencia. (*State* v. *Hunt*, 134 N. C., 684; 47 S. E., 49; *State* v. *Spivey*, 132 N. C., 989; 43 S. E., 475.)''

*State* v. *Exum*, 50 S. E. Rep., 288.

Si hubiera la corte sentenciadora seguido en el caso que ahora está sometido a nuestra consideración, la senda marcada en el caso de North Carolina hubiera procedido correctamente; pero la cuestión que tenemos que resolver es si en las instrucciones que se dieron aparecía un error que exigiera la revocación de la sentencia.

Como hemos visto ya, la instrucción dada por la corte de la *malicia premeditada*, abarca la deliberación que es elemento esencial del asesinato en primer grado, pero no del de segundo grado. El juez instruyó al jurado que la *malicia premeditada* es elemento esencial del asesinato en segundo grado, y por tanto, según las instrucciones dadas por él, es necesario que existiera la deliberación para una convicción

de este grado.    Esta instrucción no es una exposición correcta
de la ley, pero no constituye error perjudicial, y no es causa
suficiente para fundar una revocación de la sentencia.

De un debido examen de los hechos de este caso según
aparecen de la exposición de hechos que se encuentra en los
autos o según se encuentran especificados en la confesión del
acusado que hemos copiado en su totalidad anteriormente, se
verá claramente que el delito cometido fué el de asesinato en
primer grado, y que no se mostró razón alguna por la cual
pudiera rebajarse el grado de ese delito al de asesinato en
segundo grado, o a uno inferior.    El infortunado preso fué
herido cuatro veces mientras se encontraba durmiendo a
media noche.

Por esta razón no era necesario dar al jurado ninguna
instrucción con respecto a lo que constituye asesinato en se-
gundo grado, pues era bastante con darle instrucciones en
relación con el delito de asesinato en primer grado.    Debe
notarse de acuerdo con las sentencias citadas a continuación
que las cortes han declarado en casos en que los hechos tienen
alguna semejanza, pero que no son tan claros como los del
presente caso, que las instrucciones solicitadas por el acusado
con respecto a asesinato en segundo grado fueron debida-
mente denegadas por la corte.

Las cortes del continente han hecho algunas observaciones
con referencia a este particular en varios casos, en la forma
siguiente:

"El acusado había amenazado con matar a su padre repe-
tidas veces.    Una noche él se acercó a la cama de su padre, y
le disparó, matándolo, mientras dormía, con una pistola que
él había preparado, y después fué donde los vecinos y les
manifestó que otro había hecho los disparos.    Se resolvió que
la corte no erró al negar dar instrucciones de asesinato en
segundo grado."    (*Swan* v. *State,* 39 Tex. Cr. Appeal, 533.)

Cuando en un juicio por asesinato, la evidencia demuestra
que el interfecto fué muerto por disparo de arma de fuego
hecho por el acusado, estando el primero sentado, desarmado,

frente al fogón de la chimenea de su casa, no se cometió error
por la corte en no dar instrucciones de segundo grado.
(*Macklin* v. *State,* 53 Tex. Cr. App., 197.)

Cuando en un juicio por asesinato en primer grado, los
testigos de la acusación testificaron que el acusado entró en
un café, donde encontró al interfecto sentado en una mesa,
dormido, y sin decir nada al interfecto, disparó contra él,
matándolo, cuya evidencia no fué contradicha, excepto por el
testimonio del acusado en su propio beneficio, no se cometió
error por la corte al negar dar instrucciones de asesinato en
segundo grado. (*State* v. *Nichans,* 188 Mo., 304; 87 S. W.,
473.)

Cuando el interfecto fué llamado de su casa de comercio,
tarde en la noche, y pocos momentos después fué encontrado
muerto con tres heridas mortales en su cabeza, y la evidencia
tendía a demostrar que ellas fueron inferidas por el acusado,
no hubo error al negar dar instrucciones con respecto al ase-
sinato en segundo grado, puesto que el acusado era culpable
de asesinato en primer grado o inocente.

(*State* v. *Furguerson,* 162 Mo., 668; 63 So. West, 103, y
casos citados.)

Por el hecho de que la corte sentenciadora diera instruc-
ciones con respecto a asesinato en segundo grado, lo que no
era necesario según los hechos del caso, si las mismas eran
favorables al acusado, aun cuando hayan sido erróneas no
constituye un error esencial y no puede el acusado formular
ninguna objeción contra las mismas (*Tubb* v. *State,* 55 Tex.
Cr. App., 627; *Mackling* v. *State,* 53 Tex. Cr. App., 197;
*Lounder* v. *State,* 46 Tex. Cr. App., 125; *State* v. *Glahn* [Mo.],
11 Southwest. Rep., 264; *State* v. *Jackson* [Mo.], 66 South-
west. Rep., 939.)

En un caso de New York se hace referencia al mismo prin-
cipio en una forma muy clara y correcta, a saber:

"Como no se presentó cuestión alguna con respecto a homicidio
justificable en este caso, el acusado no tenía derecho a solicitar de la
corte que instruyera al jurado con referencia a ese delito; y aunque

la instrucción dada era errónea de acuerdo con la ley, no veo que dicha instrucción pudiera en manera alguna haber sido perjudicial al acusado.''

*Shorter* v. *The People,* 2 N. Y. Court App. (2 Comstock), 203.

Ningún acusado puede hacer alegación alguna con respecto a una instrucción que aunque sea errónea es demasiado favorable para el mismo. Así resultaría con la que dió la corte sentenciadora al expresar al jurado que era necesario la prueba de la deliberación para que el delito constituyera asesinato en segundo grado, la que siendo demasiado fuerte o exigiendo más de lo que la ley exigía, resultaría por tal motivo favorable al acusado y por consiguiente no sería perjudicial y era inmaterial. *State* v. *Garborough* [Kansas], 18 Pac. Rep., 474; *People* v. *Callaghan* [Utah], 6 Pac. Rep., 49; *Sparf* and *Hansen* v. *U. S.,* 156 U. S., 103 *et seq.,* y se citan casos de California y de otros estados.)

La Corte Suprema de Wyoming, por medio del Juez Sr. Conaway, en una opinión muy razonada y acabada, discute una cuestión importante que frecuentemente hemos resuelto, y que en realidad se encontraba comprendida en un estatuto de la Isla muy beneficioso, en 30 de marzo de 1905. Leyes de la Sesión de 1905, página 10. El ilustre tribunal se expresa como sigue:

"La regla con respecto a revocación de sentencias debido a instrucciones erróneas dadas al jurado por la corte y según ha sido expresado por Thompson, sobre juicios, que la regla de casi todas las cortes es 'que no se revocará ninguna sentencia porque se hayan dado instrucciones erróneas a menos que resulte probable que el jurado fué inducido erróneamente debido a dichas instrucciones.' Y de nuevo se dice: 'Por supuesto que jamás podría decirse que el jurado fué inducido erróneamente por las instrucciones erróneas que se le dieron, cuando ha llegado a un resultado correcto con su veredicto. De conformidad con este principio es la práctica de la mayor parte de las cortes antes de resolver con respecto a excepciones que se formulen a las instrucciones, e investigar la prueba y ver si el veredicto fué correcto; y si se encuentra que es así, la corte no hará ninguna otra investigación.' (2 Thomp. Trials 2401, 2402 y las autoridades

que allí se citan.)    Este principio está sostenido por numerosas auto-
ridades de la mas alta consideración.    Algunas cortes son de parecer
que la doctrina referente al error que no perjudica, no tiene igual
aplicación en casos criminales que en casos civiles, y otras cortes han
declarado que un error en las instrucciones se presuma que es perju-
dicial.    Admitiendo sin discusión o sin resolver ninguno de los pun-
tos que ambas restricciones de la regla son correctas en su debida
aplicación, puede decirse propiamente que jamás tiene una parte el
derecho a solicitar un nuevo juicio en un caso civil o criminal, porque
se haya cometido un error en las instrucciones dadas al jurado, cuando
aparece claramente de la prueba que el veredicto es correcto y que de
concederse un nuevo juicio ha de obtenerse el mismo resultado, lo que
así se obtendría si las instrucciones fueron correctas  *  *  *.    Nin-
gún fín útil podía obtenerse con el nuevo juicio.    Ninguna ventaja
podría proporcionársele al apelante.    Ninguna prueba nueva podía
cambiar el resultado.    El apelante debe a sus propias confesiones y
a sus manifestaciones el hecho que en los autos aparezca prueba que
siempre dará por resultado su culpabilidad al celebrarse un juicio
imparcial.    La otra prueba con respecto a su culpabilidad es satis-
factoria.    La celebración de otro juicio dará por resultado necesaria-
mente que se le encuentre culpable de acuerdo con cualesquiera ins-
trucciones que sean correctas.    El ha seguido los consejos de su her-
mano hasta el punto de confesar su delito, pero no hasta el de decla-
rarse culpable y de solicitar clemencia del tribunal.    Pero este es un
caso en que ni la corte sentenciadora ni esta corte tiene discreción
alguna o poder para conceder clemencia o perdón.    Al dictarse un
veredicto de culpabilidad o al alegarse la culpabilidad del delito de
asesinato en primer grado, la corte sentenciadora debe dictar la sen-
tencia que proceda de acuerdo con la ley.    Apareciendo de los autos
que esta sentencia era correcta y legal, esta corte debía confirmarla y
fijar la fecha para su ejecución.    Ya se ha dicho bastante para mos-
trar que esta corte no podía adoptar otro procedimiento.    De la
prueba aparece la comisión de un delito de asesinato atroz y a sangre
fría, siendo difícil que haya otro que pueda compararse con el mismo.
Si hay consideraciones que puedan alegarse en favor de la concesión
de clemencia y perdón en este caso, esta corte no puede tenerlas en
cuenta.    Es obligación del departamento ejecutivo en donde reside el
poder de perdonar o conmutar.    Esta corte únicamente considera los
autos y la ley.    El veredicto del jurado está completamente sostenido
por la prueba.    No hubiera podido llegarse a otro veredicto por jura-

dos que tengan en cuenta sus obligaciones con arreglo a la ley y el juramento que han prestado."

*Miller* v. *State*, 29 Pac., 139.

Las sentencias en el caso de New York están de acuerdo con estas apreciaciones y en una de ellas se dijo:

"En un caso de pena capital no se revocará el veredicto que haya sido dictado sobre los hechos a menos que la corte de apelación sea de opinión que dichos hechos no fueron debidamente tomados en consideración, o que los mismos no justificaban el veredicto. La referencia que se haga en una instrucción en un caso de asesinato a la alegación de defensa propia, como una en la que se funda el acusado para obtener un veredicto absolutorio, no es un motivo para que se conceda un nuevo juicio. El error que cometa la corte al referirse a la prueba con respecto al cual no se ha llamado su atención en el juicio, no es un fundamento para la revocación de la sentencia, especialmente cuando se ha llamado la atención al jurado de que el mismo puede corregir cualquier opinión errónea que haya formado la corte con respecto a las declaraciones y que la prueba, según se ha hecho referencia a la misma no varía sustancialmente de la que se presentó durante el juicio." *People* v. *Fitzhum*, 137 N. Y. Ct. of App. Rep., 581.

En el presente caso los hechos según fueron confesados por el acusado demuestran la comisión de un delito de asesinato voluntario, deliberado y a sangre fría en la persona de un amigo por un supuesto agravio; y no hubiera sido posible para el jurado, aun cuando se le hubiera dado una instrucción mas favorable, haber dictado otro veredicto que no hubiera sido el de asesinato en primer grado. La prueba es amplia y abrumadora; y aun cuando de los autos aparecieron algunos errores ligeros de procedimiento, no podríamos, de acuerdo con nuestro estatuto y las anteriores sentencias de este tribunal, hacer ninguna otra cosa que no fuera confirmar la sentencia condenatoria. (*El Pueblo* v. *Calero*, fallado en 12 de febrero de 1912, en el que se cita el caso del *Pueblo* v. *Clemison*, 250 Ill., 135; 95 No. East., 157.)

Por consiguiente, habiéndose llegado a los fines de la justicia con este veredicto, la sentencia dictada por la sección 2ª.

de la Corte de Distrito de San Juan, en 13 de noviembre de 1911, debe ser confirmada en todas sus partes.

*Confirmada.*

Jueces concurrentes: Sres. Presidente Hernández y Asociados Wolf, del Toro y Aldrey.